

March 31, 2025

**VIA ECF**

Molly C. Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

 Re: *Heather, et al. v. Healthline Media, Inc.*, No. 24-4168

Dear Ms. Dwyer:

Pursuant to Federal Rule of Appellate Procedure 28(j) and Circuit Rule 28-6, Plaintiffs-Appellants in the above captioned case write to notify the Court of the Seventh Circuit's recent decision in *Gardner v. MeTV*, No. 24-1290 (7th Cir. Mar. 28, 2025).

In *Gardner*, the Seventh Circuit addressed the same question presented here, whether the term "subscriber of goods and services" in the definition of "consumer" under the Video Privacy Protection Act requires a subscription to the defendant's video goods or services.

In a published opinion, the Seventh Circuit joined the Second Circuit in holding that it does not:

To: Molly C. Dwyer, Clerk of Court
Re: *Heather, et al. v. Healthline Media, Inc.*, No. 24-4168
March 31, 2025
Page 2

> Any purchase or subscription from a "video tape service provider" satisfies the definition of "consumer", even if the thing purchased is clothing or the thing subscribed to is a newsletter. So the Second Circuit recently held. [*Salazar v. National Basketball Association*, 118 F.4th 533, 546-50 (2d Cir. 2024).] We agree.

Slip op. at 5-6. The court further held that "[w]hen a person does furnish valuable data in exchange for benefits, that person becomes a 'consumer' as long as the entity on the other side of the transaction is a 'video tape service provider'." *Id.* at 6.

*Gardner* rejected many of the same statutory interpretation arguments Healthline makes here, noting that "[n]othing in the Act says that the goods or services must be video tapes or streams" and explaining that "it is the language . . . that controls the meaning of legislation." *Id.* at 5-6. The Seventh Circuit also addressed the same concerns about the scope of the VPPA Healthline raises here, emphasizing that the required connection to video content "lies in the definition of 'video tape service provider' rather than the definition of 'consumer'." *Id.* at 5.

Plaintiffs-Appellants respectfully submit that *Gardner* is materially indistinguishable from this case and further supports reversal.

To: Molly C. Dwyer, Clerk of Court
Re: *Heather, et al. v. Healthline Media, Inc.*, No. 24-4168
March 31, 2025
Page 3

Very truly yours,

**GIRARD SHARP LLP**

*/s/ Trevor T. Tan*

Trevor T. Tan

**Enclosure:** slip opinion in *Gardner*

In the
# United States Court of Appeals
### For the Seventh Circuit

_____

No. 24-1290

DAVID VANCE GARDNER and GARY MERCHANT,

*Plaintiffs-Appellants*,

*v.*

ME-TV NATIONAL LIMITED PARTNERSHIP, a Delaware limited partnership,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 22 CV 5963 — **Lindsay C. Jenkins**, *Judge*.

_____

ARGUED SEPTEMBER 13, 2024 — DECIDED MARCH 28, 2025

_____

Before EASTERBROOK, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. When Robert Bork's nomination to the Supreme Court was defeated in 1987, his name became attached not only to a political strategy ("Borking") but also to a statute, 18 U.S.C. §2710 (the "Bork Act"). This law, more formally called the Video Privacy Protection Act (VPPA or "the Act"), was the result of bipartisan revulsion against

the ease with which reporters discovered what Bork and his family had rented on video tapes. The reporters did not turn up any dirt (Bork and his family watched Hitchcock mysteries, John Hughes comedies, British costume dramas, and spy thrillers) but the ready availability of rental information caused consternation in Congress, some members of which may have had other viewing predilections.

Using terminology that is now obsolete, the Act forbids the disclosure, by any "video tape service provider", of "personally identifiable information concerning any consumer of such provider" without the consumer's consent. 18 U.S.C. §2710(b)(1). Section 2710(a)(4) defines "video tape service provider" to include any entity that sells, rents, or delivers "prerecorded video cassette tapes or similar audio visual materials"; the "similar" clause and the reference to "delivery" as well as rental makes the statute relevant to video that is streamed over the Internet. Under §2710(a)(1) "the term 'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider". This suit presents the question what it means for a person to be a "subscriber", a term that the Act does not define.

MeTV operates a web site <https://www.metv.com> at which people can watch classic video programming—principally TV shows from the 1930s through the 1990s. Anyone can watch without providing personal information—though the site does need the viewer's Internet Protocol address, which is essential to deliver the video. A web browser supplies the IP address automatically. MeTV invites people to sign up in order to personalize their experience. In exchange for a person's email address and zip code (plus a self-selected user name and password), MeTV lets a person select TV shows to

No. 24-1290 3

follow, receive reminders about when they come on (like an over-the-air station, MeTV shows programs on a schedule rather than on demand), use a "channel" finder feature, post comments about the programming, and receive notices about newly available programs.

MeTV does not charge the viewers; like over-the-air TV it makes money by selling ads. If someone just watches on the web site, advertisers cannot do much to target their pitches by viewers' (likely) preferences. The more person-specific information MeTV and its advertisers possess, the more closely they can target ads—and targeted ads sell for more than others. An email address and zip code help with targeting. And MeTV benefits when it can link a viewer to a Facebook account. Facebook collects lots of information that is available to someone who knows the user's Facebook identification number (FID). That number can be derived when someone already signed into Facebook uses the same browser to access MeTV. Plaintiffs allege that MeTV embeds in the videos a "Meta pixel" (named after the business that operates Facebook) that facilitates this linking. According to the complaint this lets Facebook know what the person is watching so it too can sell ads targeted to video preferences, and it improves MeTV's ability to promote its business on Facebook.

Plaintiffs allege in this case that they have "signed up" for MeTV, providing their email addresses and zip codes, and that they watch programming over MeTV while signed into Facebook in the same browser. This enables linking of accounts and better (from advertisers' perspective) targeting of ads on both MeTV and Facebook. The complaint asserts that neither Facebook nor MeTV has plaintiffs' consent to provide the information in the Meta pixel. Section 2710(c) provides

4                                                                  No. 24-1290

that persons injured by the un-consented disclosure of personally identifiable information may collect damages and attorneys' fees.

MeTV moved to dismiss the complaint, Fed. R. Civ. P. 12(b)(6), contending that plaintiffs are not "consumers" covered by the Act. The district court granted this motion, 681 F. Supp. 3d 864 (N.D. Ill. 2023), but allowed plaintiffs to file an amended complaint. They did so, but the district court dismissed that complaint too. 2024 U.S. Dist. LEXIS 36631 (N.D. Ill. Feb. 15, 2024).

Here again is the definition of "consumer" in §2710(a)(1): "any renter, purchaser, or subscriber of goods or services from a video tape service provider". Plaintiffs do not claim to be renters or purchasers, but they describe themselves as subscribers.

One possible response by MeTV would be that a "subscription" is something that costs money. A person who subscribes to Netflix pays a monthly fee. Someone who subscribes to the New York Times likewise pays a periodic fee to receive paper copies or to access news behind a paywall on the Internet. We assume that, as a matter of common usage, a "subscriber" gives value in exchange for goods or services. But MeTV does not contend that money is the *only* way to give value. In an Information Age, data can be worth more than money. If paying $1 a year to use MeTV would produce a subscription, then providing $1 worth of information must do so too. Every court of appeals that has considered the Act has reached this conclusion. See *Salazar v. National Basketball Association*, 118 F.4th 533, 550–53 (2d Cir. 2024); *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487–89 (1st Cir. 2016); *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1255–57

No. 24-1290                                                           5

(11th Cir. 2015). Cf. *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341–44 (11th Cir. 2017).

What MeTV argues instead is that plaintiffs subscribed to an *information* service (TV schedules and newsletters), not to a *video* service. Anyone can watch videos on the web site without supplying information (other than an IP address). This fact puts plaintiffs outside the statutory definition of "consumer", MeTV contends. And this is what the district court held. 681 F. Supp. 3d at 869–71; 2024 U.S. Dist. LEXIS 36631 at *8–10.

Back to the definition of "consumer", for a third time: "any renter, purchaser, or subscriber of goods or services from a video tape service provider". This does not say "subscriber of … *video* services"; it says "subscriber of … services *from a video tape service provider*". The complaint adequately alleges that MeTV is a video tape service provider. What more is required? If plaintiffs had signed up and never watched a video, but had purchased a Flintstones sweatshirt or a Scooby Doo coffee mug or a Superman action figure or a Bugs Bunny puzzle (MeTV's web site offers all four), then they would have purchased "goods" from a "video tape service provider". Nothing in the Act says that the goods or services must be video tapes or streams.

The Act is aimed principally at information about videos; public disclosure of his rentals is what happened to Judge Bork. And what happened to Judge Bork has some overlap with what plaintiffs allege; after all, the Meta pixel encodes the name of each video that they stream from the website. But as far as the statute is concerned, this connection lies in the definition of "video tape service provider" rather than the definition of "consumer". Any purchase or subscription from

6                                                                    No. 24-1290

a "video tape service provider" satisfies the definition of "consumer", even if the thing purchased is clothing or the thing subscribed to is a newsletter. So the Second Circuit recently held. *Salazar*, 118 F.4th at 546–50. We agree.

MeTV's argument is based more on notions about what Congress was trying to achieve than on the meaning of the words Congress selected. Yet statutes often overshoot or undershoot their goals; linguistic imprecision is part of the human condition. The Supreme Court insists that it is the language—the only thing on which Congress and the President have agreed—that controls the meaning of legislation. See, e.g., *Thompson v. United States*, No. 23–1095 (U.S. Mar. 21, 2025).

Our case is almost identical to *Salazar*. The decisions from the First Circuit and Eleventh Circuit (*Ellis*, *Yeshov*, and *Perry*) ask whether a person becomes a "subscriber" by downloading and using an application ("app") that offers videos, without necessarily providing the app's creator with personal information such as a name or email address. The First Circuit and Eleventh Circuit have reached incompatible conclusions about how the definition in §2710(a)(1) works for that situation. We do not address it here. It is enough to hold that, when a person does furnish valuable data in exchange for benefits, that person becomes a "consumer" as long as the entity on the other side of the transaction is a "video tape service provider". Plaintiffs' complaint survives a motion to dismiss under Rule 12(b)(6).

The judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.